IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| KAITLYN COX,<br><br>              Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY<br>ADMINISTRATION,<br><br>              Defendant. | CASE NO. 1:25-CV-01556-DAC<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**MEMORANDUM OPINION AND ORDER** |

### INTRODUCTION

Plaintiff Kaitlyn Cox challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry of July 28, 2025). The parties then consented to my exercising jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF #5). For the reasons below, I **REVERSE** the Commissioner's decision and **REMAND** for additional proceedings consistent with this opinion.

### PROCEDURAL BACKGROUND

Ms. Cox applied for DIB on December 1, 2022, alleging she became disabled on January 1, 2020. (Tr. 172). After the claim was denied initially and on reconsideration, Ms. Cox requested a hearing before an Administrative Law Judge. (Tr. 76-98, 113). In April 2024, Ms. Cox (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 50-75). On July 23, 2024,

the ALJ determined Ms. Cox was not disabled. (Tr. 15-49). On June 12, 2025, the Appeals Council denied her request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. § 404.981). Ms. Cox timely filed this action. (ECF #1).

### FACTUAL BACKGROUND

### I.      Personal and Vocational Evidence

Ms. Cox was 27 years old on her alleged onset date and 31 years old at the administrative hearing. (*See* Tr. 76; ECF #8 at PageID 1152). She has a bachelor's degree and has worked as an elementary school teacher and a teacher assistant. (Tr. 54, 69).

### II.     Medical Evidence

Ms. Cox has anxiety, carpal tunnel syndrome, fibromyalgia, irritable bowel syndrome (IBS) lumbar radiculopathy, lupus, rheumatoid arthritis (RA), and Sjögren's syndrome.[1] (Tr. 306, 330,

---

[1]      Fibromyalgia is a chronic condition causing widespread pain and stiffness, fatigue and tiredness, and trouble sleeping. It may also cause muscle pain and joint stiffness, numbness or tingling in the extremities, and problems with memory and concentration. *Fibromyalgia, MedlinePlus*, http://medlineplus.gov/fibromyalgia.html (last accessed June 16, 2026). The condition involves changes in how the central nervous system processes pain. It is more sensitive so a person with fibromyalgia feels pain more strongly. *Fibromyalgia, Cleveland Clinic*, http://my.clevelandclinic.org/health/diseases/4832-fibromyalgia (last accessed June 16, 2026).

Lumbar radiculopathy occurs when a nerve root in the lumbar spine is compressed or irritated, resulting in pain, numbness, and tingling near the pinched nerve. *Radiculopathy, Cleveland Clinic*, http://my.clevelandclinic.org/health/diseases/22564-radiculopathy (last accessed June 16, 2026).

Rheumatoid arthritis is a form of arthritis that causes pain, swelling, and stiffness in the joints. It is an autoimmune disease most commonly affecting the wrists and fingers. *Rheumatoid Arthritis, MedlinePlus*, http://medlineplus.gov/rheumatoidarthritis.html (last accessed June 16, 2026).

Sjögren's syndrome is an autoimmune disease that causes the immune system to attack healthy tissues and organs. The most common symptoms include dry mouth and eyes; other symptoms may include joint and muscle pain, fatigue, and numbness and tingling in the

396, 510, 613). Discussed below, her conditions cause abdominal discomfort and nausea, widespread joint and muscle pain and stiffness, low back pain, joint tenderness and swelling, headaches and migraines, numbness and tingling in her extremities, fatigue, sleep disturbances, and dizziness.

In January 2020, Ms. Cox met with her primary care physician, George Saridakis, M.D., and described a constellation of symptoms starting after she gave birth less than five months before. She reported aching joints and muscle pains in her shoulders, elbows, and hands, dizziness, abdominal cramping, diarrhea, sleep disturbances, anxiety, and feeling tired. (Tr. 515, 518). She had restricted range of motion throughout her spine, abdominal tenderness and hyperactive bowel sounds, mild upper extremity weakness with flexion and extension, and positive tender points. (Tr. 518). Dr. Saridakis diagnosed anxiety disorder, malaise and fatigue, dizziness, IBS with diarrhea, and fibromyalgia. (*Id.*).

Rheumatologist Gheorghe Ignat, M.D., examined Ms. Cox for lupus in July 2020 and diagnosed Sjögren's syndrome and fibromyalgia. (Tr. 306). Ms. Cox described poor sleep, severe fatigue, headaches, and increased aches and pains that did not improve with prednisone or Plaquenil.[2] (Tr. 307). Dr. Ignat documented synovitis in multiple joints in Ms. Cox's hands,

---

extremities. *Sjögren's Syndrome, MedlinePlus,* http://medlineplus.gov/sjogrenssyndrome.html (last accessed June 16, 2026).

[2] Prednisone is a corticosteroid sometimes used to treat some forms of arthritis and lupus. *Prednisone, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a601102.html (last accessed June 16, 2026).

Plaquenil is a brand name for hydroxychloroquine. The medication is an antimalarial and antirheumatic drug used to treat lupus and rheumatoid arthritis. *Hydroxychloroquine, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a601240.html (last accessed June 16, 2026).

tenderness in her knee and foot joints, and 12 positive tender points. (Tr. 307-08). He continued Ms. Cox's prescription for Plaquenil and prescribed gabapentin for pain relief.[3] (Tr. 306-07).

In August, Ms. Cox met with Drs. Saridakis and Ignat and reported joint pain, especially in her fingers and hands, fatigue, sleep disturbances, dizziness, headaches, and feeling weak. (Tr. 510, 301). Dr. Saridakis noted restricted range of motion throughout her spine and normal muscle strength and tone. (Tr. 513). Dr. Ignat recorded the same physical examination findings as in Ms. Cox's prior visit. (*Compare* Tr. 513 *with* Tr. 304-05).

By November, Ms. Cox's headaches had worsened, and she reported rash, fatigue, and intermittent swelling and pain in her hands, right hip and knee. (Tr. 295-96). Dr. Ignat recorded the same physical examination findings as her prior visit. (*Compare* Tr. 299 *with* Tr. 304-05). He continued her prescriptions for Plaquenil and gabapentin and prescribed prednisone. (Tr. 295).

In December, Ms. Cox expressed dissatisfaction with her rheumatology treatment during an appointment with Dr. Saridakis. (Tr. 505). There, she reported increased back and joint pain, upper and lower extremity paresthesia, arthritis in her hands and fingers, abdominal cramps, dizziness, and headaches but denied limb weakness or difficulty walking. (*Id.,* Tr. 508). Dr. Saridakis referred her to another rheumatologist, discontinued sertraline and prescribed duloxetine for fibromyalgia and anxiety and buspirone for depression.[4] (Tr. 509).

---

[3] Gabapentin is an anticonvulsant sometimes used to treat nerve pain. *Gabapentin, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a694007.html (last accessed June 16, 2026).

[4] Duloxetine is used to treat depression, anxiety, and pain associated with fibromyalgia. *Duloxetine, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a604030.html (last accessed June 16, 2026).

Buspirone is an anxiolytic used to treat anxiety. *Buspirone, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a688005.html (last accessed June 16, 2026).

Ms. Cox began treating with a new rheumatologist in February 2021. (*See* Tr. 500). Those records are not part of the administrative transcript, but Ms. Cox reported the nature of her treatment to Dr. Saridakis, who recorded it in his treatment notes. Those notes show that in March 2021 the new rheumatologist discontinued Plaquenil and prescribed methotrexate and folic acid.[5] (Tr. 500). Despite three weeks of treatment, Ms. Cox reported fatigue, significant joint pain, and swelling. (*Id.*). On examination, Dr. Saridakis noted swollen joints and restricted range of motion in her spine. (Tr. 503).

By June, Ms. Cox's rheumatologist stopped methotrexate because it caused anemia and bruising, and prescribed Humira, an injectable administered once every two weeks.[6] (Tr. 495). Dr. Saridakis prescribed meclizine for reported vertigo.[7] (*Id.*).

During her appointment with Dr. Saridakis in September 2021, Ms. Cox appeared in distress and was mildly tachycardic. (Tr. 493). She described lumbar stiffness, increased anxiety and stress, and decreased sensation in her toes and fingers. (*Id.*). She reported her rheumatologist increased Humira to once weekly. (Tr. 489). On examination, Dr. Saridakis noted erythema (redness) and effusion (swelling) in multiple finger joints bilaterally, and decreased range of motion and pain in her knees, shoulders, and hips. (*Id.*). Dr. Saridakis increased her prescriptions for duloxetine and buspirone. (Tr. 489).

---

[5]     Methotrexate is used to treat rheumatoid arthritis. *Methotrexate, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a682019.html (last accessed June 16, 2026).

[6]     Humira is an injection used to treat certain autoimmune disorders including rheumatoid arthritis. *Humira, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a603010.html (last accessed June 9, 2026).

[7]     Meclizine is used to prevent and treat nausea, vomiting, and dizziness. *Meclizine, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a682548.html (last accessed June 16, 2026).

The following month Ms. Cox reported that duloxetine helped somewhat but she still had aches and pains in her shoulders, hands, and knees, upper and lower extremity paresthesia, restricted range of motion in her spine, and was slightly tachycardic on examination. (Tr. 484, 488). Dr. Saridakis increased her prescription for buspirone to address increased anxiety. (Tr. 488).

In December 2021, Ms. Cox contracted COVID-19 and had to stop the Humira injections. (Tr. 479). In the meantime, her rheumatologist moved. (*Id.*). By January 27, 2022, Ms. Cox had been without Humira for four weeks and described more headaches, dizziness, stress, and anxiety. (*Id.*). She began wearing a knee brace after hyperextending her left knee. (*Id.*). Dr. Saridakis noted restricted range of motion throughout the spine and tenderness in the left knee. (Tr. 483).

In February 2022, Ms. Cox met with a third rheumatologist, Giuseppe Antonelli, M.D., and reported occasional migraines, IBS, musculoskeletal pain and stiffness, and arthralgias. (Tr. 311). Dr. Antonelli's handwritten notes are difficult to decipher but it appears he did not see any deformities or issues with her shoulders, elbows, wrists, hands, hips, knees, ankles, or feet on examination. (Tr. 312). He prescribed Mobic for pain relief.[8] (*Id.*). X-rays obtained that month showed mild intervertebral disc space narrowing in the lumbar spine at L5-S1. (Tr. 324).

Ms. Cox did not find relief with Mobic. (Tr. 315). In March 2022, Dr. Antonelli ordered physical therapy and prescribed Celebrex.[9] (Tr. 316). Unfortunately, Celebrex was not effective

---

[8]     Mobic is the brand name for meloxicam, a nonsteroidal anti-inflammatory drug (NSAID) used to relieve pain, tenderness, swelling, and stiffness caused by rheumatoid arthritis. *Meloxicam, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a601242.html (last accessed June 16, 2026).

[9]     Celebrex is the brand name for celecoxib, a COX-2 inhibitor (a class of NSAIDs) used to relieve pain, tenderness, swelling, and stiffness caused by rheumatoid arthritis. *Celecoxib, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a699022.html (last accessed June 16, 2026).

and at her next appointment in May Ms. Cox reported diffuse pain and poor sleep. (Tr. 317). Dr. Antonelli prescribed Voltaren for pain.[10] (Tr. 318). When Ms. Cox returned to Dr. Saridakis's office later that month, she reported "feeling much better" using Voltaren and said her joint pain improved after completing physical therapy. (Tr. 473). Dr. Saridakis continued her medications. (*Id.*).

In June, a nerve conduction study (NCS) and electromyography (EMG) testing of Ms. Cox's upper extremities revealed mild focal conduction abnormalities in the median nerves consistent with carpal tunnel syndrome. (Tr. 330).

Dr. Antonelli referred Ms. Cox to neurologist Brendan Bauer, M.D., to evaluate fibromyalgia and lupus. (Tr. 398). She reported muscle aches and fatigue, popping knee joints, stiff hands and feet, fatigue, headaches, and nausea. (Tr. 398-99). On physical examination, Dr. Bauer noted normal strength, muscle tone, sensation, reflexes, and gait. (Tr. 399). Dr. Bauer assessed fibromyalgia and lower extremity numbness and paresthesia in her bilateral feet and ordered a lower extremity EMG. (Tr. 400).

In August, Dr. Antonelli prescribed diclofenac for continued diffuse pain. (Tr. 319-20). On August 11, the lower extremity EMG revealed electrical findings consistent with bilateral moderate L5 radiculopathies. (Tr. 434). After reviewing the results, Dr. Bauer assessed lumbar radiculopathy, prescribed dexamethasone, and ordered a lumbar MRI.[11] (Tr. 396). The MRI showed a posterior

---

[10]  Voltaren is the brand name for diclofenac, a topical NSAID used to relieve pain, tenderness, swelling, and stiffness caused by rheumatoid arthritis. *Diclofenac, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a689002.html (last accessed June 16, 2026).

[11]  Dexamethasone is a corticosteroid that relieves inflammation (swelling, heat, redness, and pain) and is used to treat certain forms of arthritis. *Dexamethasone, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a682792.html (last accessed June 16, 2026).

central disc protrusion at L5-S1 with mild caudal migration (disc contents moving downward) causing anterior extradural defect and facet-joint hypertrophy without central canal or neuroforaminal stenosis. (Tr. 350).

Ms. Cox returned to Dr. Bauer's office in September and met with his certified nurse practitioner Jacqueline Graziani. (Tr. 392). Ms. Cox reported dexamethasone helped with her hand and elbow pain but not her back and knee pain. (*Id.*). She described muscle fatigue, swelling in the knees, and spasms in her hands, arms, and legs. (*Id.*). CNP Graziani determined Ms. Cox's conditions were likely autoimmune in nature but the test results for Sjögren's syndrome and lupus were inconclusive. (Tr. 394). She prescribed naltrexone for inflammatory pain.[12] (*Id.*).

In late September, Ms. Cox began taking Qulipta for migraine headaches.[13] (*See* Tr. 468). In October, she reported fewer and less intense headaches and migraines. (Tr. 388) ("nothing like they were before"). She also described back spasms and pain and swelling in her knees, hips, hands, and elbows. (*Id.*). CNP Graziani referred Ms. Cox to Robert Perhala, M.D., another rheumatologist who previously diagnosed Ms. Cox with rheumatoid arthritis, for his opinion relative to her autoimmune conditions. (Tr. 390).

---

[12]     Naltrexone is approved for treating alcohol and opioid abuse. Low-dose naltrexone is an off-label treatment for rheumatoid arthritis. *Low-Dose Naltrexone in Rheumatological Diseases, National Library of Medicine,* http://pmc.ncbi.nlm.nih.gov/articles/PMC10201089/ (last accessed June 16, 2026).

[13]     Qulipta is the brand name for atogepant, a medication used to prevent migraine headaches. *Atogepant, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a621052.html (last accessed June 16, 2026).

Ms. Cox met with CNP Graziani again in December and reported no benefit from naltrexone. (Tr. 386). Qulipta, however, significantly reduced her migraine and headache symptoms. (*Id.*). NP Graziani prescribed Imitrex as needed for acute migraine treatment. (*Id.*).

By January 2023, Ms. Cox had "significant breakthrough pain" in her fingers, wrists, hips, knees, and back. (Tr. 614). She also reported morning stiffness lasting 30 to 45 minutes and endorsed increased anxiety correlating with her pain. (*Id.*). Dr. Perhala observed full spinal range of motion, intact sensation, and normal muscle strength and tone. (Tr. 616). He also identified 14 tender joints in the wrists, fingers, lumbar spine, knees, and ankles and 4 swollen joints in the fingers. (Tr. 616-17). Dr. Perhala described her rheumatoid arthritis as "active" and prescribed Kevzara injections.[14] (Tr. 616).

During an appointment with Dr. Saridakis later that month Ms. Cox described pain and swelling in her hands, knees, and elbows, fatigue during the day, and a fast heart rate. (Tr. 462-63). She also reported naltrexone caused stomach pain. (Tr. 462).

In February, Ms. Cox reported she stopped taking naltrexone due to the side effects. (Tr. 555). She denied having migraines since her last neurology appointment but described worsening bilateral knee, back, and hand pain, difficulty sleeping, fatigue and difficulty concentrating, and increased anxiety. (*Id.*). Ms. Cox had mildly diminished muscle strength in her extremities. (Tr. 556). At Ms. Cox's request, CNP Graziani prescribed knee braces. (Tr. 557).

---

[14]     Kevzara is the brand name for sarilumab, an injectable medication used to treat rheumatoid arthritis in adults who have not found relief with other disease-modifying antirheumatic drugs (DMARD). *Sarilumab injections, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a617032.html (last accessed June 16, 2026).

In April, Dr. Perhala described Ms. Cox's rheumatoid arthritis as "very active and painful," noting escalating stiffness, swelling, and pain in her hands, wrists, knees, elbows. (Tr. 667). Ms. Cox had not started using Kevzara because her insurance company denied coverage for the medication. (*Id.*). She described some relief while taking a Medrol Dosepak, but her pain returned when she completed the treatment. (*Id.*). On examination, Dr. Perhala noted tenderness in the lumbar spine and identified 20 tender joints and 8 swollen joints. (Tr. 670).

Dr. Perhala prescribed Enbrel injections after Ms. Cox's insurance company denied her appeal for Kevzara.[15] (Tr. 665).

In mid-May, Ms. Cox reported feeling ill since her first Enbrel injection, describing occasional migraines and dizziness. (Tr. 687-88). She appeared "tired and lethargic." (Tr. 687).

At her next appointment with Dr. Saridakis on August 28, 2023, Ms. Cox had swelling in her hands and fingers, restricted range of lumbar motion, and normal upper and lower extremity strength. (Tr. 888).

Two days later, Ms. Cox had her gallbladder removed. (Tr. 726-27). Ms. Cox saw Dr. Saridakis one month after surgery and reported headaches, right knee pain, and an abdominal strain from lifting her daughter. (Tr. 869). She informed Dr. Saridakis that she restarted Enbrel after surgery and received Nurtec for her headaches.[16] (*Id.*). Her physical examination was normal. (Tr. 871).

---

[15]     Enbrel is the brand name for entanercept, an injectable medication used to treat rheumatoid arthritis. *Etanercept injection, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a602013.html (last accessed June 16, 2026).

[16]     Nurtec is the brand name for rimegepant, a medication used to prevent and treat migraine headaches. *Rimegepant, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a620031.html (last accessed June 16, 2026).

Ms. Cox returned to Dr. Saridakis's office in October and reported stomach issues, left knee and low back pain, migraines, and arthritis. (Tr. 829-31). Physical examination revealed a stable gait, normal muscle strength, and restricted spinal motion. (Tr. 831).

In December, Ms. Cox informed Dr. Saridakis she was scheduled for Botox injections for her migraines. (Tr. 812). She reported pain and tenderness in her hands and fingers and had decreased upper and lower extremity strength. (Tr. 813). Enbrel was not effective, and she was scheduled to start a new injectable medication. (*Id.*). She started the new medication, later reported to be Kevzara, in January 2024. (*See* Tr. 59, 794).

At the administrative hearing in April 2024, Ms. Cox reported Kevzara was causing an adverse reaction and her doctor intended to switch her injectable medication in June. (Tr. 59).

### III.    Opinion Evidence

On February 24, 2023, CNP Graziani completed a medical source statement describing Ms. Cox's conditions and their limiting effects. (Tr. 633-34). She opined Ms. Cox can lift less than 5 pounds occasionally; stand and walk for less than 30 minutes in an 8-hour day and less than 15 minutes uninterrupted; sit for less than one hour; and never climb, balance, stoop, kneel, crouch, or crawl. (Tr. 633). In support, CNP Graziani cited Ms. Cox's symptoms, including hand, knee, and back pain, weakness, numbness, tingling, and fatigue, and the conditions causing her symptoms, including lumbar disc protrusion with radiculopathy, rheumatoid arthritis, fibromyalgia, and carpal tunnel syndrome. (*Id.*). CNP Graziani also opined Ms. Cox can never reach, push, or pull; can rarely perform tasks involving fine and gross manipulation; must avoid heights, moving machinery, temperature extremes, and noisy environments; has severe pain that interferes with concentration and causes off-task behavior and absenteeism; and must elevate her

11

legs to at least 45 degrees as needed for pain relief. (Tr. 634). In addition to these limitations, CNP Graziani stated Ms. Cox has "difficult[y] with grip due to carpal tunnel, cannot lift, bend, twist, or stand due to pain, disturbance of skin sensation, rheumatoid arthritis, lumbar radiculopathy, and fibromyalgia" and has trouble focusing due to fibromyalgia and migraines. (*Id.*).

In May 2023, state agency medical consultant Jose Ruiz, M.D., reviewed Ms. Cox's medical records and opined she can lift and carry up to 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for about 6 hours each in an 8-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance and stoop; occasionally kneel and crouch; and never crawl. (Tr. 82). She can occasionally perform tasks involving gross manipulation (handling) and must avoid exposure to extreme cold, vibrations, and hazards such as moving machinery and unprotected heights. (Tr. 82-83).

At the behest of the state agency, consultative examiner Dariush Saghafi, M.D., interviewed and examined Ms. Cox on August 17, 2023. (Tr. 695-701). Dr. Saghafi documented painful bilateral swelling in her fingers, diminished spinal range of motion, a slow but normal gait, and normal muscle strength and sensation. (Tr. 696-97, 701). The doctor determined as follows:

> The patient suffers from RA [rheumatoid arthritis] of at least a moderate severity. She is refractory to numerous medications and has reactions to many others. The claimant is able to lift, push, and pull sufficiently to be able to perform ADLs and lift and carry up to 15-20 pounds. The claimant [can] bend, walk, and stand for up to 15 minutes.

(Tr. 697).

On August 24, 2023, state agency medical consultant Mehr Siddiqui, M.D., reviewed the available medical records and determined Ms. Cox can lift and carry up to 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for about 6 hours each in an 8-hour workday;

occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, and crouch; and occasionally crawl. (Tr. 94). She can occasionally perform tasks involving gross and fine manipulation (handling and fingering) and must avoid all exposure to unprotected heights and dangerous machinery. (Tr. 95).

IV.     **Function Report and Testimonial Evidence**

Within months of filing her application for benefits, Ms. Cox completed an Adult Function Report comprehensively detailing how her conditions affect her performance of usual activities. (Tr. 224-32). In the report, she endorsed constant pain and swelling in her fingers, wrists, and elbows; chronic exhaustion and fatigue; and pain in her hips, back, and knees. (Tr. 224). Her fingers and toes curl inward or lock into certain positions with use and her knees and back give out or buckle several times a week while bending, walking, or entering and exiting the car. (*Id.*).

On a typical day, Ms. Cox awakens, helps her daughter get dressed and eat breakfast, and watches her daughter play with toys and puzzles until lunchtime. (Tr. 226). After lunch, Ms. Cox rests while her husband, who works from home, watches their daughter. (*Id.*). Her husband also helps prepare dinner and get their daughter ready for bed. (*Id.*). For instance, he washes their daughter's hair because Ms. Cox cannot kneel at the side of the tub. (*Id.*). She relies on help from her mother or aunt at least once a week. (*Id.*).

Ms. Cox can perform most of her own personal care but uses certain modifications to avoid discomfort or as an aid to complete a task. For instance, she sits on the bed to get dressed, relies on shower bars for balance, keeps her hair short for easy maintenance, sits down to shave her legs, and switched from a manual to an electric toothbrush due to swelling and pain in her wrists

13

and fingers. (*Id.*). She can prepare simple meals so long as she does not stand for longer than 15 minutes and her fingers are not curled up or tingly. (Tr. 227). Ms. Cox can perform small tasks around the house, like picking up her daughter's toys, straightening up a room, or folding laundry for 10 minutes at a time. (*Id.*). Her husband does the deep cleaning, scrubbing, laundry, and yardwork. (*Id.*). Ms. Cox can drive but will not when her hands and feet are tingling or curling up or when she has a migraine. (Tr. 228). She does not go out alone when she is dizzy, feels tired, or has swollen joints. (*Id.*). She shops for small groceries each week while her husband retrieves the bulk and heavy items. (*Id.*).

Ms. Cox enjoys reading, watching television, swimming, crafting, and baking. (Tr. 229). She cannot read, watch television, or swim for long due to her hip, back, and knee pain. (*Id.*). Swelling and pain in her hands, wrists, and elbows limit her ability to bake and do crafts to about once a month. (Tr. 232). Ms. Cox does not socialize as much as she used to because it takes a lot of time and energy to get ready. (Tr. 229). She sees and speaks with family members regularly, attends a PTA meeting monthly, takes her daughter to dance class once a week, goes to doctor's appointments, goes to the park, and eats out with her family every other week. (Tr. 229, 232).

Ms. Cox estimated she can lift less than 5 pounds, stand and sit for about 15 minutes each, climb about 10 stairs at a time, and walk less than one block before needing to rest. (Tr. 230). She cannot squat, bend, or kneel; has blurred or double vision; and takes more time to complete tasks. (*Id.*).

At the administrative hearing in April 2024, Ms. Cox provided an up-to-date assessment of her conditions. She reported that on a typical day she wakes up at 8:00 a.m. and works with her husband to get their daughter ready for school. (Tr. 54). Her mother or aunt will transport her

14

daughter to and from school. (*Id.*). When her daughter gets home at noon, Ms. Cox feeds her lunch and supervises her while she plays. (*Id.*). During her husband's lunch break, he watches their daughter while she rests. (*Id.*). Her mother or aunt will stay with Ms. Cox during the afternoon at least four times a week to help her or give her time to rest. (Tr. 55). She takes a two-hour nap each day. (Tr. 68). She and her husband prepare dinner and then play a board game or read stories with their daughter until bedtime. (Tr. 55). Ms. Cox clarified that she goes to the monthly PTA meeting if she can and will attend by phone or get the meeting notes from another member if she cannot attend physically. (Tr. 56).

Ms. Cox cannot work because she gets migraines four times a week that last between 3 hours to an entire day, is prone to anxiety and panic attacks when not feeling well, has rheumatoid arthritis in her hands, carpal tunnel syndrome, a bulging disc, fibromyalgia, Sjogren's syndrome, lupus, and she does not sleep well. (Tr. 58). She regularly takes buspirone, Protonix, Synthroid, Qulipta, sertraline, Inderal, hydroxyzine, and Kevzara and uses Xanax, Zofran, and albuterol as needed. (Tr. 61-62). Her medications cause nausea, stomach pain, dizziness, and welts. (Tr. 62). When she has a migraine, she takes her medication and lies down in a dark and quiet room. (Tr. 66). Her husband, mother, or aunt will look after her daughter during her migraines. (*Id.*). She can lift and carry up to 10 pounds, stand for 10 to 15 minutes, walk for 10 minutes, sit for 15 minutes, can reach in front, and can reach overhead if not too high. (Tr. 62-63). She cannot kneel or crawl. (Tr. 64).

The VE testified that a hypothetical individual could not perform Ms. Cox's past relevant work if limited to the restrictions in the residual functional capacity (RFC) assessment the ALJ ultimately determined but could work as an information clerk, furniture rental clerk, or office

15

helper. (Tr. 70). If the RFC's restriction to frequent handling and fingering was changed to occasional handling and fingering, the hypothetical individual could perform as a furniture rental clerk or an usher. (Tr. 71). Needing one extra unscheduled break for 15 to 30 minutes precludes all competitive work. (Tr. 72).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 404.1505(a).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine whether a claimant is disabled:

1.    Was claimant engaged in a substantial gainful activity?

2.    Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?

3.    Does the severe impairment meet one of the listed impairments?

4.    What is claimant's residual functional capacity and can claimant perform past relevant work?

5.    Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this sequential analysis, the claimant has the burden of proof through Step Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity

16

(RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. §§ 404.1520(c)-(f), 416.920(c)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Cox had not engaged in substantial gainful activity since January 1, 2020, the alleged onset date. (Tr. 20). At Step Two, the ALJ identified seven severe impairments: (1) fibromyalgia, (2) rheumatoid arthritis, (3) autoimmune disorders, (4) carpal tunnel syndrome, (5) degenerative disc disease of the lumbar spine, (6) anxiety disorder, and (7) panic disorder. (*Id.*). At Step Three, the ALJ found Ms. Cox's impairments did not meet or medically equal the requirements of a listed impairment. (Tr. 14-16). At Step Four, the ALJ determined Ms. Cox's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except she can use a sit/stand option at her work state every hour that lasts for five minutes; she can occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; frequently balance or stoop; occasionally kneel, crouch, or crawl; frequently handle and finger; never be exposed to extreme temperatures or concentrated pulmonary irritants such as fumes, dust, odors, and chemicals; must avoid unprotected heights and dangerous machinery; perform simple routine tasks with short, simple instructions; make simple decisions; tolerate occasional workplace changes; and no strict production rate or hourly quotas.

(Tr. 29). The ALJ found Ms. Cox cannot perform her past relevant work. (Tr. 42). At Step Five, the ALJ determined Ms. Cox could perform other work, including as an information clerk,

furniture rental clerk, and office helper. (Tr. 43). Thus, the ALJ concluded Ms. Cox was not

disabled. (Tr. 44).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the

Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by

substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 833

(6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of

evidence but less than a preponderance and is such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.,* 966 F.2d 1028,

1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective

reading of the record. Substantiality of evidence must be based upon the record taken as a whole.

Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the

substantiality of evidence must take into account whatever in the record fairly detracts from its

weight." *Brooks v. Comm'r of Soc. Sec.,* 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the

court does not review the evidence de novo, make credibility determinations, or weigh the

evidence. *Brainard v. Sec'y of Health & Hum. Servs.,* 889 F.2d 679, 681 (6th Cir. 1989). Even if

substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position,

the court cannot overturn "so long as substantial evidence also supports the conclusion reached by

the ALJ." *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a

18

"zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not follow its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

### DISCUSSION

Ms. Cox argues the ALJ erred in two ways: (1) by improperly evaluating the persuasiveness of the opinion evidence, and (2) by improperly evaluating her pain. (ECF #9 at PageID 1155). Both arguments challenge the ALJ's consideration of the medical evidence in the context of fibromyalgia. (*Id.* at PageID 1170, 1171). I need only consider Ms. Cox's second assignment of error.

Ms. Cox argues the ALJ improperly relied on findings of normal strength, gait, and reflexes to discount her reported pain even though her conditions are the "types of impairments that often

19

produce disabling pain without corresponding abnormalities on routine neurological examination." (ECF #9 at PageID 1170-71). For the reasons that follow, I find the ALJ erred in evaluating Ms. Cox's statements about her fibromyalgia-related symptoms.

As part of the RFC assessment, the ALJ must evaluate the claimant's statements about her asserted symptoms. Evaluating an individual's subjective symptoms is a two-step process. Social Security Ruling (SSR) 16-3p, 2017 WL 5180304, at *3 (Oct. 25, 2017). First, the ALJ must consider whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id.* Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second step, the ALJ may consider evidence directly from the claimant or gleaned from other medical and non-medical sources. *Id.*

In evaluating the limiting effects of a claimant's symptoms, the ALJ begins by considering how consistent the claimant's statements about her symptoms are with objective medical evidence. *Id.* at *5. If the ALJ "cannot make a disability determination or decision that is fully favorable based solely on the objective medical evidence," the ALJ must carefully consider all evidence in the record to reach a conclusion about the intensity, persistence, and limiting effects of a claimant's symptoms, including:

1. the claimant's daily activities;

2. the location, duration, and frequency of the alleged symptoms;

3. factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of medication;

4. treatment other than medication; other efforts made to alleviate the symptoms; and

> 5.      other factors regarding the claimant's functional limitations.

20 C.F.R. § 404.1529(c)(3). The ALJ must discuss the factors pertinent to the evidence of record. SSR 16-3p, 2017 WL 5180304, at *8. Using those factors, the ALJ determines the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.* at *2.

The ALJ's explanation must be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007); *see also* SSR 16-3p at *10. An ALJ need not accept a claimant's subjective statements about the claimant's symptoms when the statements are inconsistent with the objective medical and other evidence. *See Rogers*, 486 F.3d at 247-48; SSR 16-3p at *8. Nor does the ALJ have to "make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts." *Kornecky v. Comm'r of Soc. Sec.*, 167 F.App'x 496, 508 (6th Cir. 2006). Absent compelling reason, a court may not disturb the ALJ's analysis of the claimant's subjective complaints, or the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-cv-98, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019).

Under the two-step analysis, the ALJ first determined Ms. Cox's medically determinable impairments could reasonably be expected to cause her symptoms. (Tr. 31). Then, the ALJ determined that "[a]side from intermittent findings related to the claimant's spine and her reports of intermittent symptoms related to FM [fibromyalgia] and/or RA [rheumatoid arthritis], the record demonstrates generally that the claimant retained full muscle strength, normal sensation

and reflexes, and a normal gait" and concluded the evidence supports limitations, but not to the extent alleged. (Tr. 34-35). In evaluating Ms. Cox's symptoms, the ALJ found her "alleged physical functional limitations are not entirely consistent with [her] reported daily functioning, the examination findings of record, and the persuasive portions of the medical opinions." (Tr. 37). The ALJ explained that spinal imaging supported the existence of a spinal impairment but Ms. Cox's alleged difficulty with sitting, standing, and walking was inconsistent with findings generally showing normal muscle strength, sensation, reflexes, and gait. (Tr. 36). The ALJ also cited Dr. Perhala's findings from January 2023 showing normal muscle strength, sensation, and full range of motion as inconsistent with Ms. Cox's reported pain, emphasizing those findings over simultaneous observations of swelling and tenderness in her lumbar spine, knees, and ankles. (*Id.*). Addressing Ms. Cox's alleged difficulty with lifting, the ALJ pointed to findings of full upper extremity strength and that she can lift her 40-pound daughter. (*Id.*). Finally, the ALJ stated the state agency consultants' opinions were generally consistent with the evidence. (Tr. 37).

The ALJ's evaluation is problematic for several reasons. First, widespread pain in the joints, muscles, tendons, or nearby soft tissues are the hallmarks of fibromyalgia. *See* SSR 12-2p, 2012 WL 3104869, at *2 (July 25, 2012). "In stark contrast to the unremitting pain of which [fibromyalgia] patients complain, physical examinations will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions." *Preston v. Sec. of Health & Human Servs.*, 854 F.2d 815, 817-18 (6th Cir. 1988). "The nature of fibromyalgia itself" thus "renders such . . . [an] overemphasis upon objective findings inappropriate." *Rogers*, 486 F.3d at 249. Thus, findings of normal muscle strength, sensation, reflexes, and gait are not necessarily inconsistent with complaints of diffuse fibromyalgia-related pain and fatigue. While the ALJ must

22

consider objective findings in evaluating a claimant's fibromyalgia-related symptoms, courts in the Sixth Circuit have held the ALJ errs when in placing undue emphasis on that objective medical evidence to discount a claimant's statements about her symptoms. *See, e.g., Davila v. Comm'r of Soc. Sec.*, 993 F.Supp.2d 737, 754-55 (N.D. Ohio Jan. 28, 2014) (finding ALJ erred by focusing her symptoms evaluation on the lack of objective medical evidence and failing to discuss other relevant factors and evidence); *Foster v. Comm'r of Soc. Sec.*, 382 F.Supp.3d 709, 716-17 (S.D. Ohio Apr. 10, 2019) (finding ALJ erred in relying on objective medical evidence and the claimant's lack of treatment where the ALJ failed to address claimant's treatment regimen). In this case, the ALJ relied largely on normal findings of muscle strength, sensation, reflexes, and gait as evidence to discount Ms. Cox's statements about the severity of her pain and fatigue when those findings are not necessarily inconsistent with fibromyalgia symptoms.

Second, the ALJ's conclusion that Ms. Cox's alleged symptoms are inconsistent with her daily activities is not supported by substantial evidence. Before addressing the medical evidence, the ALJ summarized Ms. Cox's statements about her impairments as follows:

> The claimant has alleged disability from difficulty with lifting more than five to 10 pounds, walking longer than 10 minutes and/or farther than one block, standing or sitting longer than 15 minutes, squatting, bending, kneeling, climbing stairs, reaching, and using her hands. She reported that she experiences back spasms and knee pain that cause her to "buckle" three times per week. She also reported that her fingers, wrists, and elbows swell and are painful, and her hands swell, curl, and go numb. She reported feeling exhaustion and fatigue. Her spouse, mother, or aunt assist her with taking care of her daughter (*e.g.*, lifting and bathing her, driving her to and from preschool). She has difficulty with personal care that involves prolonged standing or the use of her hands; she sits to dress herself, uses shower bars for stability, and has difficulty caring for her hair. She reported dropping things easily and having to brace herself to sit and stand. Her spouse helps her with chores that require lifting, scrubbing, and yard work. She reported using knee braces since February of 2023. She has injection medication she can self-administer every two weeks, but she has side effects and may need to change medications. She also has

alleged difficulty with talking, seeing, memory, completing tasks, concentrating, and following instructions. She reported forgetting details and thoughts, experiencing brain fog, and getting double vision. She also reported difficulty concentrating due to pain. She can pay attention for 30 minutes before needing a break. She does not finish what she starts because she usually needs a break to rest during activities. She has difficulty with detailed spoken instructions. She needs someone to accompany her in case her symptoms worsen. She has some difficulty handling stress, and she reported having panic attacks and fear of engaging in activities.

The claimant also reported that she cares for her daughter by getting her dressed, heating her breakfast and lunch, and supervising her from morning to afternoon. She follows written instructions "pretty well" depending on her symptoms. She testified that she could concentrate on and understand the plot of a two-hour movie if she could get up or change positions during it. She does not need reminders to care for her personal needs or grooming. She can prepare simple meals and assists her spouse with preparing family meals. She can perform household chores such as folding clothes, making the bed, and straightening up. She can go out alone but does not do so often. She can drive depending upon her symptoms. She has never been fired or laid off from a job because of problems getting along with other people. She spends time with others in person, on the phone, by text, and by video chat; she talks to family daily and sees others in person about twice per week. She also attends PTA meetings depending upon her symptoms. She handles changes in routine "pretty well." She can pay bills, count change, handle a savings account, and use a checkbook/money order.

(Tr. 30-31) (cleaned up). But beyond listing these reported daily activities, the ALJ does not explain how Ms. Cox's reported pain and fatigue are inconsistent with those activities, which the ALJ is required to do. *See* SSR 16-3p, 2017 WL 5180304, at *8 ("We will explain which of an individual's symptoms we found consistent or inconsistent with the evidence . . . and how our evaluation of the individual's symptoms led to our conclusions.").

Moreover, the ALJ's listing of daily activities mischaracterizes quite a few of Ms. Cox's statements regarding the scope of her functioning and thus offers little support for the ALJ's conclusions. *See Rogers*, 486 F.3d at 248-49 (finding an ALJ's use of a claimant's daily activities to question the credibility of her statements inappropriate because the ALJ mischaracterized the

24

scope of those activities and did not examine the physical effects those activities revealed). For instance, the ALJ does not address Ms. Cox's statement that she takes a two hour nap every day, usually within three to four hours of awakening. (Tr. 68, 224). The ALJ relied on Ms. Cox's reported ability to prepare simple meals and help her husband prepare meals, but the ALJ did not explain why she rejected Ms. Cox's report that she can do so only when her fingers are not curled up or tingly and she does not need to stand for more than 15 minutes at a time. (Tr. 227). Similarly, the ALJ found Ms. Cox can perform household chores, but makes no mention that her husband helps her with chores, and he does all chores requiring lifting, scrubbing, and yard work. (*Id.*). The ALJ also makes no mention that Ms. Cox testified she can help with some light household chores, but only for about 10 minutes at a time. (*Id.*). "[T]he mere fact that [a claimant] is able to perform some household activities when his level of pain allows him to do so is not inconsistent with [a claimant's] claim that his pain prevents him from engaging in regular and continuous employment." *Meece v. Barnhart,* 192 F.App'x 456, 466 (6th Cir. 2006). Ms. Cox's activities of preparing some meals when her hands and pain allow and performing some chores with assistance from her husband with daily a two-hour nap are not comparable to typical work activities.

Last, the ALJ determined Ms. Cox's alleged functional limitations are not entirely consistent with the persuasive portions of the state agency medical consultants' opinions. But those opinions, and the ALJ's evaluation of those opinions, were primarily based on the normal objective findings. In the context of fibromyalgia, "opinions that focus on objective medical evidence are not particularly relevant." *Rogers,* 487 F.3d at 243-44. Here, in his assessment of the consistency of her statements with her symptoms-related limitations, Dr. Ruiz found Ms. Cox's

reports of pain and dysfunction not entirely consistent with the objective medical evidence showing normal motor strength and tone, intact sensation, and normal gait. (Tr. 81). On reconsideration, Dr. Siddiqui determined Dr. Ruiz's prior findings were consistent with and supported by the medical evidence of record. (Tr. 95). And the ALJ found the state agency medical consultants' opinions "partially persuasive because they are generally supported by the evidence the consultants reviewed (*e.g.*, examination where the claimant retained full muscle strength, normal sensation and reflexes, and a normal gait; imaging supporting the claimant's spinal impairment)." (Tr. 40). Thus, both opinions focus on the lack of objective medical evidence for Ms. Cox's fibromyalgia. The ALJ's reliance on these opinions to discount Ms. Cox's reported pain and fatigue is thus inappropriate for the same reason as the ALJ's reliance on the underlying objective findings. *Rogers,* 487 F.3d at 243-44 (in the context of fibromyalgia, "opinions that focus on objective medical evidence are not particularly relevant").

In sum, the ALJ unduly emphasized the normal objective findings despite their diminished relevance in determining the severity of Ms. Cox's fibromyalgia-related symptoms and mischaracterized the scope of her daily functioning. These errors are not harmless. *See Ulman v. Comm'r of Soc. Sec.,* 693 F.3d 709, 714 (6th Cir. 2012) (holding that harmless-error analysis applies to ALJ's evaluation of claimant's statements concerning the intensity, persistence, and limiting effects of symptoms). The Sixth Circuit has held that the pain associated with fibromyalgia can be disabling. *Preston,* 854 F.2d at 818 ("There is no doubt that Preston suffers from disability due to her fibrositis [(the condition now known as fibromyalgia)]."). If the ALJ were to accept Ms. Cox's statements about the limiting effects of her symptoms, it is entirely possible for the ALJ to find her pain and fatigue prevent her from working on "a regular and continuing basis" and thus conclude

she is disabled. *See* SSR 96-8p, 1996 WL 374184, at \*1 (July 2, 1996) (A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule).

This error alone warrants remand, but the ALJ's over-emphasis of the normal objective findings extends beyond her analysis of Ms. Cox's symptoms and the state agency medical consultants' opinions. The ALJ also determined CNP Graziani's opinion that Ms. Cox's conditions (including fibromyalgia) result in disabling symptoms was not persuasive because it was not supported by her own examinations of Ms. Cox showing normal strength, sensation, reflexes, and gait and was inconsistent with other medical records documenting those same findings. (Tr. 41-42). On remand, the ALJ should reassess Ms. Cox's statements concerning the intensity, persistence, and limiting effects of her symptoms and re-evaluate the medical opinions.

## CONCLUSION

After review of the record, the parties' arguments, and the law, I **REVERSE** the Commissioner's decision denying disability insurance benefits and **REMAND** for additional proceedings consistent with this opinion.

Dated: June 24, 2026

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

27